IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DAY, LLC, et al., | ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | 2:16-cv-00429-LSC |
| PLANTATION PIPE LINE COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF OPINION**

Plaintiffs Day, LLC ("Day") and Kent Upton ("Plaintiff Upton") (collectively "Plaintiffs") brought this action against Plantation Pipe line Company ("Plantation") and Kinder Morgan Energy Partners L.P. ("Kinder Morgan") (collectively "Defendants") alleging various state-law tort claims as well as claims under the citizen-suit provisions of the Clean Water Act ("CWA") and Resource Conservation and Recovery Act ("RCRA"). The Court has before it Defendants' Motion for Partial Summary Judgment (doc. 54), as well as Defendants' Motion to Exclude Testimony of Barry Sulkin (doc. 56) and Second Motion to Exclude Testimony of Barry Sulkin (doc. 81). For the reasons stated more fully herein,

Defendants' Motion for Partial Summary Judgment is due to be granted; their Motion to Exclude Testimony of Barry Sulkin is due to be granted; and their Second Motion to Exclude Testimony of Barry Sulkin is due to be denied as moot.

## I. BACKGROUND

Defendants own a pipeline system that runs from Louisiana to Washington, D.C. which transports refined petroleum products such as diesel and gasoline. In 1979, Plantation discovered a dent in the pipeline in Shelby County, Alabama near the crest of Double Mountain. Plantation determined that if the dent was not repaired, that section of the pipeline stood a higher chance of failure. Plantation undertook to repair the dent by the installation of a "B-sleeve," a full-encirclement, pressure-containing sleeve.

Before it is installed, a B-sleeve is composed of two separate half-pipe pieces that fit together to form a slightly larger pipe section. The B-sleeve is cut along the length of the pipe, so that if one was to look at the cross-section of a B-sleeve there would be two half-circles of equal circumference. In order to install the B-sleeve as Plantation did in 1979, an operator lays the two sections of the B-sleeve over the affected area, welds along the seams connecting the two parts of the B-sleeve to form what is essentially a larger pipe-sleeve that wraps around the full

circumference of the pipe, and the affected area. The circumferential ends of the B-sleeve are then welded so that they close the ends of the sleeve. A B-sleeve is pressure containing, so that even if the affected area leaks, the leaking fluid cannot normally escape past the B-sleeve. (Wright Depo at 51-53.)

Under 49 C.F.R. § 195.452, Defendants were required to create so-called Integrity Management Programs ("IMPs") for pipeline segments in "high consequence areas." IMPs are written frameworks that operators use to prevent pipeline accidents and implement where an accident occurs. Defendants' current IMP requires that the B-sleeve used to "patch" a dent would require an epoxy filler be placed between the dent and the B-sleeve. (Doc. 83-6 at 1; Caligiuri Depo. at 98-99.) However, at the time of the repair in 1979 Plantation's maintenance standards did not require any filler, and there in fact was no filler placed between the dent and the B-sleeve.

In 1989, Plantation excavated the dented portion of the pipeline to determine whether the use of a non-low-hydrogen weld around the B-sleeve had led to any hydrogen embrittlement, which could compromise the integrity of the seal. (*Id.* at 111-112.) Defendants conducted a nondestructive examination technique called a "dye penetrant inspection" to test for defects along the weld of the B-sleeve.

(Caligiuri Report at 13.) The technique did not expose any issues in the 1979 repair's integrity, and after additional visual inspection, Defendants reburied the pipe section. Following the 1989 test, there appears to have been no further excavations of the pipeline until the leak in 2014. In 2000, Kinder Morgan began to operate Plantation and the pipeline, employing a number of sophisticated techniques and operations to monitor the operation of the pipeline.

Plaintiffs own in total approximately 250 acres of land adjacent and contiguous to Defendants' right of way for the pipeline. The property is used for commercial and recreational hunting and fishing. Plaintiff Upton also resides on the property. On August 21, 2014, Grant Upton, who is Plaintiff Upton's son, called his father to tell him that there was a strong smell of gasoline in the valley and that he observed gasoline pooling in a stream in the valley floor of Double Mountain on Plaintiff Upton's property. Plaintiff Upton came to the property and then called Plantation to report what he believed to be a gasoline leak.

Plantation mobilized employees and third-party contractors, and by that evening had assembled approximately one hundred persons at the site. Plantation also contacted the Alabama Department of Environmental Management ("ADEM") and the United States Environmental Protection Agency ("EPA")

about the release. Three days later on August 24, 2014, Plantation had traced the source of the leak to the section of the pipeline that was repaired in 1979 with the B-sleeve. It completed repairs of the pipeline on that same day. A later laboratory analysis of the B-sleeve and underlying pipeline section showed that a crack had developed within the dent that had been sleeved in 1979.

Plantation and its contractors continued their emergency response and cleanup based on written plans for product recovery and monitoring local surface water bodies. By September 2, 2014, Plantation had completed its emergency response actions and had transitioned to long-term site management. ADEM and EPA representatives completed a site walk on September 10, 2014, and agreed that all measures up to that point were completed satisfactorily.

During the initial emergency response and into the long-term site management phase, one of Plantation's contractors, CH2M Hill Engineers, Inc. ("CH2M") prepared a number of reports on behalf of Plantation to submit to state and federal regulators. After submitting a summary report of emergency response actions, CH2M submitted a Site Assessment Work Plan (the "Work Plan") which laid out a number of tasks to find the extent of the damage, continue monitoring risk areas, and remediate the site. ADEM approved the Work Plan on October 6,

2014. Throughout 2015, CH2M submitted multiple reports to ADEM that kept the regulator abreast of the remediation and testing work CH2M was performing, and allowed ADEM to continue to monitor and propose additional clean-up measures.

## II. STANDARD OF REVIEW

A motion for summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues to be resolved at trial. *Anderson*, 447 U.S. at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all

factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). "[T]he moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### III. DAUBERT MOTION

Defendants argue that Plaintiffs' expert Barry Sulkin ("Sulkin")'s testimony that there continues to be an ongoing leak from the pipeline should be excluded under Rule 702 and the framework of *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993). Rule 702 states that a:

> witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court has the obligation to screen expert evidence under Rule 702 to ascertain if it "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "[T]he requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590 . *Daubert*'s requirements apply not only to scientific knowledge, but also to all forms of specialized knowledge on which experts testify. *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 149 (1999). Under *Daubert*, the Court's inquiry is flexible, but "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 594–595.

*Tampa Bay Water v. HDR Engineering, Inc.* directs the Court to conduct a three-part inquiry to determine the admissibility of expert testimony, weighing whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

731 F.3d 1171, 1183 (11th Cir. 2013) (quoting *City of Tuscaloosa v. Harcros Chems.*, *Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

Sulkin's testimony is key to Plaintiffs' CWA claim because, as stated below, in order for Plaintiffs to maintain their CWA claim they must show that there is an ongoing violation at the time they filed suit. Sulkin stated in his expert report and testified during his deposition that there was a continuing leak in the pipeline.

Defendants argue that Sulkin's testimony to such should be struck because (1) he is not qualified to testify on whether the pipeline is continuing to leak based on pipeline design and site geology and (2) the methodology Sulkin uses to testify to the pipeline leakage is not based on reliable principles or methods.

Sulkin is an environmental consultant with over forty years of experience studying the impacts of a variety of pollutants on surface waters, ground waters, and wetlands. He has worked as an environmental regulator for what is now the Tennessee Department of Environment and Conservation and for the EPA. (Doc. 74 at 4.) Sulkin has visited the contamination site on two different occasions, in February 2017 and April 2017, and in both occasions he observed, smelled and performed sampling of ongoing gasoline contamination. He took samples of water and sediment during those visits and sent those samples to laboratories for analysis which confirmed the presence of gasoline. Sulkin also based the conclusions contained in his expert report on the documents submitted by Defendants to ADEM as part of the ongoing reporting requirements.

Defendants asked Sulkin during his deposition how he came to the conclusion that there was an ongoing release of gasoline from Defendants' pipeline.

He first identified that the gasoline smell was a "fresh" smell as opposed to a smell of gasoline that has decayed:

> Q: . . . I want to make sure I understand what you're saying about the possibility that there's an ongoing release of the pipeline, okay? Are you saying to a reasonable degree of scientific certainty that's your opinion that there's an ongoing release there?
>
> A: Yes.
>
> Q: Have you done any testing to determine that?
>
> A: Only the testing for the BTEX constituents.
>
> Q: Right
>
> A: And what I saw and smelled at the site.
>
> Q: Okay
>
> A: Smells way too fresh for being two years old.

(Doc. 67-1 at 207-08.) Sulkin then goes on to describe in another case how he had suspected an ongoing leak based on the smell of "fresh gasoline, even after the source storage tank was tested by a pressurizing device and showed there was no leak. Eventually, according to Sulkin, after digging around the tank a hole was spotted in the tank, showing that the "fresh" smell of gasoline correctly indicated an ongoing leak. (*Id.* at 211-12.) However, Sulkin does not

explain this methodology in greater detail other than stating that the smell of fresh

gasoline is different than stale gasoline.

Sulkin additionally stated that the high elevation at which he saw gasoline led

him to conclude there is an ongoing release:

> Q: . . . So do you have any other basis for your belief that there's an
> ongoing release?
>
> A: Yes.
>
> Q: Tell me what.
>
> A: As I described earlier, the elevation, to me, makes it
> incomprehensible that all the free product hasn't always moved down
> into the valley. It's just too steep, too long a time since the release that
> if it wasn't free product it would be gone by now, and what would be
> coming out of the ground would be very faint and diluted. It wouldn't
> still be enough to grow the orange material, wouldn't have that strong
> presence of gasoline.

(*Id.* at 211.)

There are significant problems with Sulkin's competency to render the

opinion that there is an ongoing leak based on the two methods stated above, i.e.,

the "smell-test" and the geology of the site. Sulkin admits he is not a geologist and

he has not studied the geology of the release site. (Sulkin Depo. at 44, 216.) While

he has worked with other gasoline spills before, he has never worked with sites that

are in mountainous terrain like the Plantation pipeline. (*Id.* at 216.) He likewise admits has not conducted any mapping of the "plume migration," the direction of movement of the gasoline through the groundwater, because he doesn't "do that kind of work." (Sulkin Depo. at 213.) His theory of a continuous leak is thus based on the shaky inference that because the pipe leak occurred at a high elevation, gravity must have already pulled all gasoline to lower elevations, and because there is still gasoline at high elevations there still is a leak.

Plaintiffs offer no basis for this theory, and while Sulkin may be qualified to testify on the remediation of dangerous chemical spill sites Plaintiffs have not shown how he is qualified to testify on the movement of gasoline through subsurface. "Merely demonstrating that an expert has experience, however, does not automatically render every opinion and statement by that expert reliable." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1201 (11th Cir. 2010). The Advisory Committee Notes to Rule 702 state:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." . . . The more subjective and controversial the expert's

inquiry, the more likely the testimony should be excluded as unreliable.

Committee Notes on Rules—2000 Amendment (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)). While Sulkin states that he is relying on his experience as a chemical spill remediation expert, he has failed to show how his experience is sufficient for the opinions he has rendered in this case, i.e., concerning the effect of gravity on the movement of gasoline away from the pipeline. Sulkin does not account for the other explanation offered by Defendants for why he smelled "fresh" gasoline—that the leaked gasoline could be trapped below the soil surface in a non-porous pocket. During his deposition, Sulkin admits that gasoline could be continuing to leak from a non-porous pocket, but says he has not studied the geology of the site and is not competent to render an opinion on that explanation. (Sulkin Depo. at 215.)

Sulkin has likewise opined on why there is an ongoing leak, stating that he believes the repair to the B-sleeve was incorrectly done:

> The only other factor that sort of weighs in is I know this leak was from an old repair that re -- that failed again. So it wouldn't be surprising to me that it's failed again or never stopped failing. It's like trying to patch an inner tube on your bicycle . . . That patch isn't always going to seal all around the edges, and it's going to leak again.

It's time to get a new tube. So my best guess – and I wouldn't even call it a guess. My best opinion is that there's an active leak.

(Sulkin Depo. at 213.) However, Sulkin himself is admittedly not qualified to testify on causes of the leak. He is not a metallurgist and does not consider himself an expert in relation to Department of Transportation regulations as they relate to pipelines. (*Id.* at 45.) In the following exchange during Sulkin's deposition, Sulkin admits he is not qualified to testify on whether the repair was properly performed:

Q. Okay. Let me get back to sort of just general questions. Do you have any opinions, Mr. Sulkin, regarding the cause of this release?

A. Not independently, but I have read and discussed with the parties. So I know the cause was a leak, a broken piece of pipe that had previously been repaired.

Q. Right, okay. But you don't have any expertise in pipeline releases or cracks or things of that nature –

A. No. Just like I said –

Q. -- that could have caused this release?

A. No, nothing –

Q. All you know is what you've read --

A. And discussed.

Q. -- or discussed or seen in reports?

A. Correct.

Q. And so you're not going to offer any testimony as to defects concerning the pipeline itself?

A: That's correct.

(Sulkin Depo. at 88-89.) While Plaintiffs include other portions of Sulkin's deposition where he does in fact testify to the defects and causes of the pipeline leak, he is by his own admission unqualified to testify to this issue. Thus, because Sulkin is not qualified to testify competently regarding whether there is an ongoing leak and has not properly supported the methodology by which he reached this conclusions, his testimony as to that matter is due to be excluded from the Court's consideration.[1]

## IV. DISCUSSION

Defendants seek summary judgment for all of Plaintiffs' claims except Count One, Negligence, and Count Five, Nuisance. In addition, Plaintiffs concede that summary judgment is due to be granted on their claims of gross negligence and

---

[1] Additionally before the Court is Defendants' Second Motion to Exclude the Testimony of Barry Sulkin. (Doc. 81.) As the conclusions Defendants seek to exclude from Barry Sulkin's expert report have not been relied upon by Plaintiffs in their Opposition to Summary Judgment, Defendants' Second Motion to Exclude is DENIED as MOOT.

strict liability. (Doc. 62 at 3 n.1.) The Court turns to each of Plaintiffs' remaining claims:

## A. WANTONNESS[2]

Plaintiffs allege that Defendants' failure to update the repair of the 1979 B-sleeve according to the newest repair standards constitutes wantonness under Alabama law. Wantonness is "the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Ex parte Essary*, 992 So.2d 5, 9 (Ala. 2007) (citing *Bozeman v. Cent. Bank of the South*, 646 So.2d 601

---

[2] Because Plaintiffs' only claim for punitive damages necessarily relies on the survival of their wantonness claim, which is due to be dismissed, their claim for punitive damages is also due to be dismissed. Plaintiffs point out that in *Lewis v. Kinder Morgan Energy Partners, L.P*, which dealt with a similar suit against Defendants for a leak in their pipeline, the district court recently denied summary judgment for plaintiffs' punitive damages claim. No. CV 8:15-4792-HMH, 2017 WL 1541857, at *5 (D.S.C. Apr. 28, 2017). However, *Lewis* does not contain any convincing analysis that allows the Court to compare the facts before it with those that led the court in *Lewis* to deny summary judgment on this damages theory. In fact, *Lewis* merely states in regards to punitive damages:

> Viewing the facts in the light most favorable to the Plaintiffs, there is sufficient evidence on which a jury could find that the Defendants acted willfully, wantonly, or recklessly with respect to the 1990 sleeve repair and maintenance and management of the Pipeline.

*Id. Lewis* contains no analysis additional to the quotation above, nor does it identify what evidence allowed it to make its conclusion that summary judgment should be denied in regards to the punitive damages claim. Given that its holding is in no way binding on this Court, and its reasoning is not applicable to this case, *Lewis* does not help the Plaintiffs' argument.

(Ala. 1994) (emphasis in original)). While negligence is characterized as "the inadvertent omission of duty," wanton misconduct is characterized by the state of mind of consciously taking an action with knowledge that "the doing or not doing of [the act] will likely result in injury. . . ." *Id.* (quoting *Tolbert v. Tolbert*, 903 So.2d 103, 114–15 (Ala. 2004)). "Wantonness is a question of fact for the jury, unless there is a total lack of evidence from which the jury could reasonably infer wantonness." *Cash v. Caldwell*, 603 So.2d 1001, 1003 (Ala. 1992).

Plaintiffs' argument in favor of wantonness is in essence that the efforts that Plantation took in 1979 to repair the dent in the pipeline would not be the same repairs that Defendants would have taken in 2014, and because Defendants knew that they would have made different repairs had the dent occurred in 2014, they knew that their failure to re-repair the dented pipeline would likely cause injury to the Plaintiffs. Plaintiffs read a requirement into the applicable regulations and standards for Defendants to continuously update past, permanent repairs to their pipeline according to the newest standards. But no statute, regulation, or internal procedure manual requires the Defendants to do so. The parties agree that the standards for pipeline repair in a High Consequence Area ("HCA") are controlled by the current version of 49 C.F.R. 195.452, the Defendants' IMP, and the

American Society of Mechanical Engineers ("ASME") Code B31.4. ASME B31.4, titled "Pipeline Transportation Systems for Liquid Hydrocarbons and Other Liquids," is explicitly incorporated into the standards of 49 C.F.R. 195.452. *See* 49 C.F.R. § 195.3. Neither the current version of ASME B31.4, nor the applicable version in 1979, require that a dent, such as the dent discovered in Defendants' pipeline in 1979, would be filled with epoxy filler before the application of a B-sleeve.  The current version of ASME B31.4 additionally provides that, "This Code shall not be retroactive, or construed as applying to piping systems installed before date of issuance shown on document title page." (Caligiuri Report at 16.) On the other hand, the Defendants' current IMP requires that a dent repaired with a B-sleeve have the hardened epoxy filler placed in the dent before the B-sleeve is welded on. No such requirement existed in 1979.

Defendants' expert Caligiuri states that the 1974 version of ASME B31.4, which was applicable when Plantation discovered the dent in 1979, would not require the use of epoxy filler between the dent and the B-sleeve. Plaintiffs suggest that because Defendants did not re-repair the 1979 B-sleeve according to the newest standards, that it was *per se* unsafe. Defendants have offered testimony that the B-sleeve repair made in 1979 is classified as a "permanent" repair, which

means that "once it's in, . . . you don't need to be concerned about it anymore, . . . as opposed to a temporary repair where you need to go back and investigate it continuously." (Caligiuri Depo. at 160.) As the Defendants understood it, there was no need to re-repair the B-sleeve because it was meant as a permanent fix. It could be that the new repair methods were introduced because they were cheaper, or easier to perform, and not necessarily because they are safer. Simply arguing that the 1979 B-sleeve repair is not the method that Defendants would use now does not show wanton behavior, without showing that the Defendants knew that the 1979 B-sleeve repair was unsafe. While newer repairs may not use the same method of repair, Plaintiffs have not shown any law, regulation, standard, or guideline that requires Defendants to retroactively alter a B-sleeve repair. Plaintiffs' wantonness claim is therefore due to be dismissed.

## B. TRESPASS

Plaintiffs additionally assert that the incident surrounding the leak of gasoline from Defendants' pipeline into Plaintiffs' property constitutes trespass under Alabama law. "In *Rushing v. Hooper-McDonald, Inc.*, 293 Ala. 56, 300 So. 2d 94 (1974), [the Alabama Supreme] Court held that an indirect trespass occurs

where the trespasser releases a 'foreign polluting matter' beyond the boundaries of his property, knowing to a 'substantial certainty' that it will invade the property."

*Russell Corp. v. Sullivan*, 790 So. 2d 940, 946-47 (Ala. 2001). In order to establish an indirect trespass, a plaintiff must prove:

> 1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and 4) substantial damages to the res.

*W. T. Ratliff Co., Inc. v. Henley*, 405 So. 2d 141, 145 (Ala. 1981) (quoting *Borland v. Sanders Lead Co., Inc.*, 369 So. 2d 523, 529 (1979)).

Plaintiffs are unable to show trespass by the Defendants' release of gasoline from their pipeline because they are unable to show that Defendants intentionally did the act which resulted in the invasion of Plaintiffs' property. Plaintiffs re-raise their argument in favor of intentionality that they asserted in their wantonness section above, i.e., that Defendants' failure to re-repair the B-sleeve according to Defendants' current IMP procedure renders the eventual leak and release of gasoline "intentional." (Doc. 62 at 15 ("Thus, [the] same evidence warranting the denial of summary judgment on Plaintiffs' wantonness claims also supports the

denial of Plaintiffs' trespass claims."). But, as stated in the Court's analysis of Plaintiff's wantonness claims *supra*, such a theory is unconvincing.

The only additional argument raised against summary judgment for trespass is the rather unremarkable statement that "[p]ipeline ruptures happen every day around the State of Alabama" and that Defendant Plantation has had previous spills in the same county where the spill on Plaintiff's property occurred. Plaintiffs present no evidence that these spills were in any way similar to the spill that affected their property, or that would show knowledge that the Court could impute "intentionality" to the Defendants' omission. Therefore, summary judgment is due to be granted in favor of Defendants on Plaintiffs' trespass claim.

## C. EMOTIONAL DAMAGES

Plaintiff Upton argues that he is entitled to emotional distress damages for Defendants' negligence in allowing the gasoline to leak onto his property. As Defendants have not moved for summary judgement on Plaintiffs' negligence claim, but have moved for summary judgment on emotional distress damages under a negligence theory, the Court addresses whether Plaintiff Upton can recover emotional distress damages. To show entitlement for emotional distress damages in Alabama, a plaintiff must show that he either "sustain[ed] a physical injury as a

result of a defendant's negligent conduct, or [was] placed in immediate risk of physical harm by that conduct." *City of Mobile v. Taylor*, 938 So. 2d 407, 410 (Ala. Civ. App. 2005) (quoting *Wal–Mart Stores, Inc. v. Bowers*, 752 So.2d 1201, 1203 (Ala. 1999)).

*AALAR, Ltd. v. Francis* demonstrates the operation of the "zone of danger" test for emotional distress damages where the plaintiff has not suffered a physical injury as the result of the defendant's negligent conduct. 716 So.2d 1141 (Ala. 1998). In *AALAR*, a car rental company had negligently rented out a car that continued to be listed as stolen on the National Crime Information Center database. *Id.* at 1147. The two plaintiffs, a mother and son, were unaware of the car's illicit status. *Id.* A police officer confronted the son while he was in the car and pointed a gun at the plaintiff as he reached for the glove box to retrieve the rental agreement. *Id.* The mother was inside the house when the incident occurred. *Id.* at 1148. *AALAR* held that although the son was in the zone of danger because of the pistol being pointed at him, the mother was outside the "zone of danger," as she was totally unaware of and physically unthreatened by the police officer's actions. *Id.* at 1147-48.

Here, Plaintiff Upton has not shown he was in the "zone of danger." Plaintiff Upton admittedly owns the property that was affected by the leak of gasoline from Defendants' pipeline, but he has offered no evidence that he was ever in "immediate risk of physical harm" by Defendants' negligent conduct.

Plaintiffs argue that Plaintiff Upton "was on the property in the vicinity of the spill immediately after the rupture in the pipeline, while the gasoline was actively flowing into the streams and wetlands." Plaintiffs' statement is factually true, but hardly shows Plaintiff Upton was in the zone of danger given that the property is 130 acres. During his deposition, Plaintiff Upton stated that his son was halfway up to Plaintiff Day's valley when he smelled gas. (K. Upton Depo. at 219.)The son called Plaintiff Upton at work, and he then left work to go to the spot where the son had smelled gasoline. (*Id.* at 220.) Both Plaintiff Upton and his son saw gasoline floating in a creek, and because of the current's direction determined it was coming from Defendants' pipeline. (*Id.*) Plaintiff Upton then called Defendant Plantation to alert it of the possibility of the leak and then returned to complete his shift at work. (*Id.* at 221-22.) Plaintiff Upton presents additional testimony that he has seen oil sheens in the creeks and riverbeds, (*Id.* at 289-90),

and that he was subsequently irritated by the noise and smell from the repairs by Defendants. (*Id.* at 261-63.)

Simply seeing gasoline and the awareness of possible gasoline contamination is not enough to put Plaintiff in the zone of danger caused by Defendants' negligence. Although there was a gasoline smell and visible gasoline in the creek when Plaintiff first went to the part of the property near the pipeline, these physical signs of a leak are not enough for him to be in "immediate risk of physical harm." Indeed, after seeing the gasoline in the creek, Plaintiff called Defendants and returned to his work. If Plaintiff had truly been placed in "immediate risk of physical harm" and suffered resultant emotional damages therefrom, one would expect something more than his seemingly lax response to the leak.

Without specifying exactly whether Plaintiff Upton was *actually* injured by exposure to gasoline vapors or was simply exposed to the immediate risk of physical harm under the emotional damages test, Plaintiff Upton also argues that he is entitled to emotional distress damages because gasoline contains known carcinogens and the current contamination levels in certain parts of Upton's property were above residential risk levels. A search of Alabama state law does not produce a case directly addressing whether the possibility of inhalation of known

carcinogens can entitle a plaintiff to emotion damages under the zone-of-danger test. *Metro-North Commuter R. Co. v. Buckley* offers persuasive interpretation of an emotional distress claim under the Federal Employers' Liability Act ("FELA"), which applied the zone-of-danger test. 521 US 424. In *Buckley*, a railroad worker was negligently exposed to carcinogenic asbestos, but did not have any symptoms from diseases caused by inhalation of asbestos at the time that he brought suit against his former employer. *Id.* at 426-27. The Supreme Court addressed whether plaintiff's mere exposure to asbestos in the course of his job, and commensurate increased risk of cancer, would allow him to recover for negligently caused emotional distress. *Buckley* answered in the negative. After review of the "zone of danger" test's application in common law jurisdictions, *Buckley* noted that the test usually required the danger of immediate and traumatic harm, such as in cases of vehicular collisions or accidents, explosions, assaults, and in one case, x-rays, where immediate physical harm to the fetus was suspected. *Id.* at 430-431 (collecting cases). Conversely, looking at the so-called "physical impact" requirement under FELA, *Buckley* held that physical contact alone does not necessarily support emotional damages:

in particular, [the cited common law cases] do not include a contact that amounts to no more than an exposure—an exposure, such as that before us, to a substance that poses some future risk of disease and which contact causes emotional distress only because the worker learns that he may become ill after a substantial period of time.

*Id.* at 432. Although it addressed the recovery of emotional damages under FELA, rather than Alabama common law, *Buckley* shows that exposure to a substance, be it gasoline or asbestos, that has a "latent" effect, cannot support a claim for emotional damages because the plaintiff is not subject to immediate and traumatic harm.

Plaintiffs additionally state Plaintiff Upton was in the zone of danger because David Chung ("Chung") said that he and other responders had "risked their lives" when they went to the site to investigate and clean up the leak on behalf of Defendants. However, Plaintiffs omit Chung's subsequent clarification:

Q: Okay. Tell me how your team risked their lives.

A: It's—you don't know what you're—when you're first walking into the woods, you don't know—it's a figure—you know, were they in danger, no, but when you're first walking in, you don't know what you're dealing with at a release; that's what I mean.

(Chung Depo. at 26.) It appears thus that Chung meant to say that before going to the affected area there was a possibility that they would be risking their lives, but

did not in fact "risk their lives." Even if Chung testified that he and his team "risked their lives" in investigating the leak, Plaintiff Upton was not with or near Chung during the time Chung first came to the site. Because Plaintiff Upton has not shown any physical injury nor has he shown any evidence that he was placed in immediate risk of physical harm by the Defendants' negligence, he cannot recover for emotional damages for negligence.

Plaintiffs additionally argue they are entitled for emotional damages in relation to the nuisance and wantonness claims. As stated above, Plaintiffs' wantonness claims are without merit, but the Court addresses Plaintiffs' emotional damages claims nonetheless as the same standard applies to their nuisance claims, which are not subject to summary judgment. A plaintiff is entitled to emotional damages for nuisance and wantonness under Alabama law "if the mental suffering inflicted is accompanied by malice, insult, inhumanity, or contumely." *Rice v. Merritt*, 549 So. 2d 508, 511 (Ala. Civ. App. 1989) (citing *Gregath v. Bates*, 359 So.2d 404 (Ala. Civ. App. 1978)).

Plaintiff Upton present no evidence that arises to the level of "malice, insult, inhumanity, or contumely" sufficient to allow his claim for emotional damages arising from his nuisance or wantonness claim to continue. He points to a single

exchange during Plaintiff Upton's deposition as supporting such claims for emotional damages:

> Q: In your dealing with [Defendant Plantation] since the release, have you ever had any unpleasant dealings with anybody?
>
> A: I would say, yes—
>
> . . .
>
> Q: Tell me about that.
>
> A: I really can't remember what it was. It was—I think, basically, he[3] was saying there was no fuel in the water. And obvious as heck, it's fuel.
>
> Q: Okay.
>
> A: It's kind of like, you know—and I think he even made the comment one time, "Well, it looked like somebody poured gasoline in the creek." You know, just—and it just, you know, just like so unprofessional.
>
> Q: Just ticked you off?
>
> A: Yeah.

(K. Upton Depo. at 248-49.) This exchange does not show that "a Plantation pipeline employee . . . accused [Plaintiff Upton] of pouring gasoline on his own

---

[3] It is unclear from the deposition testimony who the "he" is that Kent Upton is referring to, although the Court assumes from the context it was a Plantation employee or contractor.

land" as Plaintiff Upton's deposition testimony itself states the employee said "somebody" without any direct accusation. It goes without saying that the above interaction that Plaintiff Upton did not have any direct effect on him since he states that he "can't remember what [the interaction] was." Even taking the above evidence in the light most favorable to Plaintiffs, they cannot recover emotional damages simply because Defendants were at time unprofessional or Plaintiff Upton was "ticked off." Thus, Plaintiffs' claims for emotional damages are due to be dismissed.

## D. CWA Claims

Congress enacted the CWA in 1972 to restore and maintain the "chemical, physical, and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). In accordance with this purpose, Section 301(a) of the CWA makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act. *See* 33 U.S.C. § 1311(a). To establish a CWA violation, Plaintiffs must show that: "(1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; (5) without a NPDES permit." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004). Defendants first argue that Plaintiffs' CWA violations are due to be dismissed

because there is no "ongoing violation," which is necessary for this Court to possess subject matter jurisdiction over citizen-suit CWA violations under 33 U.S.C. § 1365(a), and alternatively because Plaintiffs have not identified a "point source" where an illegal discharge is occurring. As the Court finds that Plaintiffs have failed to show proof of an ongoing violation, it lacks subject matter jurisdiction under § 1365(a) to consider Plaintiffs' CWA claim.

Under § 1365(a)(1), a citizen may commence a lawsuit in federal court against:

> any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who *is alleged to be in violation of* (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .

(emphasis added). *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.* resolved a circuit split over whether a defendant's conduct that occurred wholly prior to the filing of the lawsuit is sufficient to satisfy the "alleged to be in violation of" language of § 1365(a). 484 U.S. 49, 56 (1987). After extensive analysis of the language of § 1365(a) and the CWA generally, *Gwaltney* concluded that § 1365(a) does not support citizen suits for wholly past violations:

The most natural reading of "to be in violation" is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future.

*Id.* at 57. Rather, a plaintiff must show a "continuous or intermittent" violation under § 1365(a) for a court to possess subject matter jurisdiction.

After addressing this preliminary issue of the type of violation that would support a CWA citizen suit, *Gwaltney* then went on to raise a separate issue: the sufficiency of evidence required to show a "continuous or intermittent" violation under § 1365(a). The Supreme Court relied on the phrase "alleged to be in violation" in § 1365(a) as opposed to "in violation" to hold that well-pled allegations alone are sufficient to support jurisdiction, *id.* at 64, and a plaintiff is not required to submit any additional proof at the initiation of the suit. *Gwaltney* then appeared to indicate that at the summary judgment stage, a defendant may still attack the court's subject-matter jurisdiction by challenging the accuracy of the jurisdictional facts alleged:

This is not to say, however, that such allegations may not be challenged. In *United States v. SCRAP*, 412 U.S. 669, 689, 93 S. Ct. 2405, 2417, 37 L.Ed.2d 254 (1973), we noted that if the plaintiffs' "allegations [of standing] were in fact untrue, then the [defendants] should have moved for summary judgment on the standing issue and demonstrated to the District Court that the allegations were sham and

raised no genuine issue of material fact." *If the defendant fails to make such a showing after the plaintiff offers evidence to support the allegation, the case proceeds to trial on the merits*, where the plaintiff must prove the allegations in order to prevail. But the Constitution does not require that the plaintiff offer this proof as a threshold matter in order to invoke the District Court's jurisdiction.

*Id.* at 65-66 (emphasis added).

The majority then determined that the action should be remanded to the lower court to find whether the respondents' complaint "contained a good-faith allegation of ongoing violation by petitioner." *Id.* at 67. The decision to remand to the lower court to determine "good-faith allegations" was somewhat confusing, as the appeal had reached the highest court after dismissal at the summary judgment stage. The instruction to the district court to determine whether there were allegations of ongoing violations, rather than proof of jurisdictional fact normally required at summary judgment, appeared to contradict general summary judgment standards.

Concurring in the judgment, Justice Scalia sought to clarify the majority's instructions over the evidentiary requirements to prove subject matter jurisdiction at the summary judgment stage:

There is of course nothing unusual in the proposition that only an allegation is required to *commence* a lawsuit. Proof is never required,

and could not practicably be required, at that stage. From this clear and unexceptionable language of the statute, one of two further inferences can be made: (1) The inference the Court chooses, that the requirement for commencing a suit is the same as the requirement for maintaining it, or (2) the inference that, in order to maintain a suit the allegations that are required to commence it must, if contested, be proved. It seems to me that to favor the first inference over the second is to prefer the eccentric to the routine. It is well ingrained in the law that subject-matter jurisdiction can be called into question either by challenging the sufficiency of the allegation or by challenging the accuracy of the jurisdictional facts alleged. Had Congress intended us to eliminate the second form of challenge, and to create an extraordinary regime in which the jurisdictional fact consists of a good-faith belief, it seems to me it would have delivered those instructions in more clear fashion than merely specifying how a lawsuit can be commenced.

*Gwaltney*, 484 U.S. at 65–66 (Scalia, J., concurring). Subsequently, *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.* reiterated Scalia's concurrence by requiring factual proof of an ongoing CWA violation at the summary judgment stage:

the showing necessary to maintain a suit for civil penalties must go beyond mere allegations. Plaintiffs must be able to prove that non-compliance was ongoing at the time they filed suit in order to be able to later maintain an action for civil penalties.

897 F.2d 1128, 1135 (11th Cir. 1990).

In light of *Gwaltney* and *Tyson Foods*, the Court applies the traditional summary judgment standards to determine whether Plaintiffs properly supported

their claims of a continued or intermittent CWA violation. Plaintiffs first argue that the "continued presence of petroleum on the Upton's properties, which is unequivocal and undisputed, satisfied the 'ongoing violation' requirement of [the] CWA," although Defendants' pipeline is no longer leaking. (Doc. 62 at 23.)

The Eleventh Circuit has not directly ruled on what constitutes an ongoing violation, and two competing interpretations have arisen since *Gwaltney*. On the one hand, some courts have taken a broad view of what constitutes an "ongoing" violation: that the failure to undertake remedial measures to remove the effects of a wholly past violation of the CWA constitutes an ongoing violation. *See Sasser v. EPA*, 990 F.2d 127, 129 (4th Cir. 1993) ("Each day the pollutant remains in the wetlands without a permit constitutes an additional day of violation."); *City of Mountain Park v. Lakeside at Ansley, LLC*, 560 F. Supp. 2d 1288, 1293 (N.D. Ga. 2008); *Informed Citizens United, Inc. v. USX Corp.*, 36 F. Supp. 2d 375, 377-78 (S.D. Tex. 1999); *United States v. Reaves*, 923 F. Supp. 1530, 1534 (M.D. Fla. 1996); *North Carolina Wildlife Federation v. Woodbury*, No. 87-584-CIV-5, 1989 WL 106517, at *1-2 (E.D.N.C. Apr. 25, 1989).

On the other hand, some cases regard the "wholly past" language in *Gwaltney* as directing the inquiry to when the conduct causing the violation

occurred, rather than to whether consequences of that violation have been remedied. *Connecticut Coastal Fishermen's Association v. Remington Arms Co.*, 989 F.2d 1305 (2d Cir. 1993) ("The present violation requirement of the [CWA] would be completely undermined if a violation included the mere decomposition of pollutants."); *Coon v. Willet Dairy, LP*, Nos. 5:02-CV-1195 and 5:04-CV-917, 2007 WL 2071746, at *2-3, 2007 U.S. Dist. LEXIS 51718, at *6 (N.D.N.Y. July 17, 2007) (dismissing CWA claims because the defendant had entered into a consent order with the state environmental agency prior to the lawsuit, and the plaintiffs presented no evidence that the violation was ongoing or likely to recur); *Aiello v. Town of Brookhaven*, 136 F.Supp.2d 81, 120 (E.D.N.Y. 2001) (holding CWA does not allow citizen suit against a past polluter "for the ongoing migrating leachate plume"); *Wilson v. Amoco Corp.*, 33 F.Supp.2d 969, 975-76 (D. Wy. 1998) ("migration of residual contamination from previous releases does not constitute an ongoing discharge, and that to so hold would undermine the CWA's limitations as set forth in the statute's definition of point source and the Supreme Court's holding in *Gwaltney*."); *Friends of Santa Fe Cty. v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1354 (D.N.M. 1995) ("Migration of residual contamination resulting from previous releases is not an ongoing discharge within the meaning of the [CWA].").

Plaintiffs cite *City of Mountain Park v. Lakeside at Ansley, LLC*, for the proposition that the Defendants' failure to remove the previously discharged petroleum constitutes a "continuing violation" under the CWA. 560 F. Supp. 2d 1288, 1293 (N.D. Ga. 2008). However, *Mountain Park* hurts Plaintiff's position, as after presenting the two conflicting interpretations to the meaning of "continuous violation," *Mountain Park* sought to explain the disparate approaches:

> [T]he primary factor that influenced the court to adopt the [broad] approach was the nature of the alleged pollution in this case--deposited sediment and fill material. *Unlike discharges of a leachate plume, or petroleum products, the fill materials at issue in this case do not significantly dissipate or dissolve over time.* Instead, these fill materials, when discharged into a system such as the plaintiff's lakes, stay intact over time and thus continue to have roughly the same net polluting effect years or even decades after the time of their deposit.
>
> This distinction seems to be borne out by the relevant caselaw. The majority of cases dealing with fill materials appear to adopt the [broad] approach of deeming the pollution "ongoing" as long as the polluting fill material remains in the water. In contrast, most of the decisions taking the stricter interpretation of "wholly past" violations . . . have involved pollutants other than fill materials.

*Mountain Park*, 560 F.Supp.2d at 1293 (emphasis added) (citations omitted).

*Mountain Park* thus bases its conclusion of an ongoing violation on the nature of the pollution. Had the fill materials in *Mountain Park* been petroleum products—as in this action—the court seemed to indicate it would not find an ongoing violation

based purely on the presence of the petroleum without a continuing or intermittent discharge from a point source.

Following the conclusion of the briefing period for Defendants' Motion for Partial Summary Judgment, Plaintiffs sought and were granted leave to file additional authority for their argument that Defendants' pipeline leak constitutes an ongoing violation. (*See* Docs. 84 & 86.) Plaintiffs informed the Court that on April 12, 2018, the United States Court of Appeals for the Fourth Circuit issued a published opinion in the case styled, *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, No. 17-1640, 2018 WL 1748154, at *1 (4th Cir. Apr. 12, 2018). *Upstate Forever* reversed a district court decision that there was no ongoing violation where a pipeline had ceased leaking, but petroleum product from that pipeline continued to move in a plume to "navigable waters." *Id*. Although *Upstate Forever* includes pertinent analysis to § 1365(a), the Court ultimately disagrees with the majority's conclusion that a wholly past discharge can constitute an ongoing violation of the CWA.

The majority begins, like this Court, in recounting *Gwaltney*'s guidance that the phrase "to be in violation" in § 1365(a) only authorizes suits for "prospective relief." *Upstate Forever*, 2018 WL 1748154, at *5. Upstate Forever then goes on to

interpret the "ongoing violation" jurisdictional language of § 1365(a) in light of the

identical language in the civil suit provision of the RCRA, 42 U.S.C. § 6972, as

interpreted in *Goldfarb v. Mayor of Baltimore*, 791 F.3d 500 (4th Cir. 2015). The

Fourth Circuit in *Goldfarb v. Mayor of Baltimore*, held that there was an ongoing

violation of the RCRA where the City of Baltimore had stored hazardous chemicals

that had leaked from the point of storage and continued to migrate through the soil.

*Goldfarb* rejected the argument that the violation was wholly past, stating that

"although a defendant's conduct that is causing a violation may have ceased in the

past . . . what is relevant is that the violation is continuous or ongoing." *See id*. at

511–13. *Goldfarb* did not specify *which* violation was continuous or ongoing, it stated

instead:

> The foregoing paragraphs in the Complaint [contained at pages 32-34
> of the Appendix] assert specific, identifiable actions attributed to the
> City that allegedly violated RCRA-based mandates, have gone
> uncorrected, and continue unabated such that the City is still "in
> violation of" those mandates. . . . In the case at bar, some of the City's
> alleged actions occurred in the past and some are ongoing, but the
> purported violations of "any permit, standard, regulation, condition,
> requirement, prohibition, or order" promulgated under RCRA are
> alleged to be "ongoing."

*Id.* at 513.  At least some of the RCRA violations alleged in the plaintiffs' complaint

in *Goldfarb*, however, could occur where the conduct was wholly in the past.

It is correct to state, as *Goldfarb* did, that past conduct can support an "ongoing violation" of the RCRA—because the citizen-suit provision of the RCRA under § 6972(a)(1)(A) looks to whether the defendant is "alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order." *Upstate Forever*, however, makes a logical jump when it states the conclusion in *Goldfarb* of an ongoing violation is "equally applicable" to the CWA. *See* 2018 WL 1748154, at \*5 & n.6 ("We disagree with the dissent's view that our decision in *Goldfarb* is not helpful. We held in *Goldfarb* under an identical citizen suit provision that conduct causing a violation need not be ongoing to state a claim, so long as the violation itself is ongoing.").

The CWA's definition of what constitutes a "violation" materially differs from the RCRA. The CWA requires that there be a discharge of a pollutant into navigable waters from any point source, 33 U.S.C. § 1362(12)(a)—but makes no statement qualifying the conduct, i.e., the discharge, by use of "past or present." Cessation of conduct, e.g., the discharging of a pollutant, under the CWA means that there is no longer a violation. On the other hand cessation of conduct does not necessarily cure a violation of any "permit, standard, regulation, condition, requirement, prohibition, or order [under the RCRA]," 42 U.S.C. § 6972(a)(1)(A).

Presumably the regulations at issue in *Goldfarb* could have been violated by past conduct—although *Goldfarb* never stated with specificity what regulations the defendant was alleged to have violated. In that sense, it is incorrect to equate the "ongoing violation" language of the RCRA and CWA, by improperly importing the definition of "violation" from the RCRA and using it to determine *when* CWA violations can occur.

*Gwaltney* was clear that a plaintiff's interest under the CWA is "primarily forward-looking." 484 U.S. at 59. A plaintiff "must allege a state of continuous or intermittent violation," said plainly that "a past polluter [which is what Defendant appears to be] will continue to pollute in the future." *Id.* at 57. The inescapable "prospective orientation" of the phrase "in violation" is mirrored by the relief the CWA affords plaintiffs suing under the citizen-suit provision, which does not give citizen-plaintiffs the right to damages. *See id.* at 61-62 (Section 1365 of the CWA is "wholly injunctive in nature"); *City of Evansville v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008, 1014 (7th Cir. 1979). Any injunction to cease the CWA violation in this action, i.e., the point source discharge, would be superfluous because Defendants' pipeline has not leaked since 2014—two years before the initiation of this suit.

*Upstate Forever* alternatively attempts to ground its interpretation of "ongoing violation" in the definition of "discharge of a pollutant" by stating that it "does not place temporal conditions on the discharge of a pollutant from a point source." 2018 WL 1748154, at *6. There is an obvious lack of temporal specification in the phrase, but the word "discharge" itself is rather clear— Defendants are either discharging pollutants from a point source or they are not. The *Upstate Forever* majority states attempts to stretch the definition by reliance on the so-called "indirect discharge" theory. *Id.* An indirect discharge occurs when a pollutant is discharged from a point source to a *locus* that is not a "navigable water." The pollutant then reaches navigable waters by means of groundwater flow or some other natural means pushing the pollutant through "intervening conduits." There is substantial support for an indirect discharge theory, but the courts adopting such a theory do so in a context where the point source itself is continuing to discharge or it intermittently discharging. *See Rapanos v. United States*, 547 U.S. 715, 743 (2006) (plurality); *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 742 (9th Cir. 2018). Even under the indirect discharge theory, the Court still has no jurisdiction over Plaintiffs' CWA claim because at the time of the

suit there was no continuous or intermittent discharge from a point source, regardless of how the pollutant reached navigable waters.

The Fifth Circuit likewise addressed the definition of "point source" in *Hamker v. Diamond Shamrock Chemical Co.*, which dealt with the plaintiffs' allegations that defendants' pipeline leaked onto their property, although defendants fixed the leak by the beginning of the suit. 756 F.2d 392, 394 (5th Cir. 1985). Like in both *Upstate Forever* and this action, in *Hamker* "[n]o continuing addition to the ground water from a point source is alleged . . . . Rather, the complaint alleges, necessarily, only that there are *continuing effects* from the past discharge." *Id.* at 397 (emphasis added). *Hamker* rejected the arguments that Plaintiffs raise here concerning the effects from a wholly past discharge, and that the single "discharge" of oil from a pipeline does not create a continuing discharge regardless of the residual effects of that discharge.

An "ongoing violation" is one where this is "either continuous or intermittent violation-that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Tyson Foods*, 897 F.2d at 1133 (quoting *Gwaltney*, 484 U.S. at 57.) Justice Scalia's concurrence in *Gwaltney* strongly indicates that the

causes of the violation, not the lingering effects, should be used to determine whether there is an ongoing violation:

> When a company has violated an effluent standard or limitation, it remains, for purposes of [§ 1365(a)] , "in violation" of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate *the cause of the violation*.

*Gwaltney*, 484 U.S. at 69 (Scalia, J., concurring). Here the cause of the CWA violation is tied to the leak of the Defendants' pipeline. Defendants have submitted a great amount of evidence that they have repaired the pipeline. Plaintiffs on the other hand offered solely the testimony of their expert Sulkin for the conclusion that the pipeline continues to leak, but as shown above, his testimony to that effect is due to be struck as unreliable under *Daubert*. There is no other indication that Defendants' pipeline was leaking at the time of the filing of this action. While some effects remain from the leak, at the time of Plaintiffs' filing there was not point source discharge, nor was there any "reasonable likelihood" of future point source discharge from Defendants' pipeline. The violation is therefore not "ongoing."

Plaintiffs include new allegations in their Response in Opposition to Summary Judgment that Defendants "fail[ed] to address the unlawful dumping of dredge and fill waste into the streams and wetlands on the Upton's lands. Each day

the dredge and fill waste is allowed to remain in the water . . . is a daily and ongoing violation of the CWA. (Doc. 62 at 25.) Plaintiffs made no allegations concerning unlawful dredging and filling of waste products in their Complaint, and cannot raise this issue for the first time in opposition to summary judgment. Plaintiffs have failed to support their allegations of an ongoing violation with facts properly admissible at trial. The Court thus lacks jurisdiction under § 1365(a) to adjudicate their claims of CWA violations.[4]

---

[4] Plaintiffs additionally make arguments about ongoing "point source" discharges from the movement of gasoline constituents throughout their property based on a flawed interpretation of *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993 (11th Cir. 2004). *Parker* is factually distinct from this action because the pollutants at issue there were piles of debris and metal construction equipment that continued to discharge new pollutants after the objects were placed there by the defendants. *Id.* at 1009 ("Storm-water runoff does not, in all circumstances, originate from a point source, but several courts have concluded that it does when storm water collects in piles of industrial debris and eventually enters navigable waters."). The continuing presence of the debris and construction equipment served as "discernible, confined and discrete conveyance" from which pollutants were discharged. In this action, even construing the term "point source" "broadly," there is no point source discharge following the initial leak in the Defendants' pipeline. While the Eleventh Circuit has not squarely addressed whether the migration of pollutants through soil and groundwater is a point source discharge, other circuits have. *See Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1141 n.4 (10th Cir. 2005), as corrected (Oct. 21, 2005). In defining a nonpoint source discharge, in contrast to a point source discharge, *Sierra Club* held:

> Nonpoint source pollution is not statutorily defined, although it is commonly understood to be pollution arising from dispersed activities over large areas that is not traceable to a single, identifiable source or conveyance. *Groundwater seepage that travels through fractured rock would be nonpoint source pollution, which is not subject to NPDES permitting.*

It must be emphasized that the conclusion that there is no ongoing CWA violation, because there is no ongoing discharge from a point source, does not necessarily absolve past violators from any and all liability for their acts. The CWA citizen-suit provision is part of the bulwark against the spread of pollution harmful to the environment, but it is not the only protection—nor should it be the chief. *See Gwaltney*, 484 U.S. at 60 ("the citizen suit is meant to supplement rather than to supplant governmental action."). Other state and federal laws provide a latticework of responsibilities and liability for *past and present* conduct, including the RCRA, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") 42 U.S.C. § 9601 *et seq.*, enforcement activities by ADEM, and Alabama tort law.

It is undisputed that Defendants have worked with ADEM over years to remediate and improve the conditions caused by the release of gasoline from their pipeline. Plaintiffs' argument seeks to wield the citizen-suit provision of the CWA as a hammer to address any and all effects of the pipeline leak rather than the fine scalpel that it is, "chang[ing] the nature of the citizens' role from interstitial to

---

*Id.* (emphasis added) (citation omitted). In this action, the leaked petroleum is traceable to a point source, i.e., the pipeline. But after its release from the pipeline, the movement of the gasoline through fractured rock does not create a new point source.

potentially intrusive." *Gwaltney*, 484 U.S. at 61. *Gwaltney* in part premised its

interpretation that § 1365 does not support citizen suits for wholly past violations

on fears of private action overtaking regulators' primary role:

> Th[e] danger [of undermining the supplementary role of citizen suits]
> is best illustrated by an example. Suppose that the Administrator
> identified a violator of the Act and issued a compliance order under
> § 309(a). Suppose further that the Administrator agreed not to assess
> or otherwise seek civil penalties on the condition that the violator take
> some extreme corrective action, such as to install particularly effective
> but expensive machinery, that it otherwise would not be obliged to
> take. If citizens could file suit, months or years later, in order to seek
> the civil penalties that the Administrator chose to forgo, then the
> Administrator's discretion to enforce the Act in the public interest
> would be curtailed considerably. The same might be said of the
> discretion of state enforcement authorities. . . .We cannot agree that
> Congress intended such a result.

*Id.* at 60-61. Defendants' discharge ceased in 2014, days after it was discovered.

Defendants then worked with ADEM and the EPA over two years to remediate the

site to their specifications. Plaintiffs' CWA claim intrudes on these regulators'

authority, and seeks to redress a wrong already righted *under the CWA*. It is

therefore due to be dismissed for lack of jurisdiction.

## E. RCRA

Defendants additionally move for summary judgment on Plaintiffs' claim

under the RCRA. 42 U.S.C. § 6901, *et seq*. The "RCRA is a comprehensive

environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (citation omitted). The citizen suit provision of the RCRA provides in pertinent part that "any person may commence a civil action on his own behalf" against "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). "The section applies retroactively to past violations, so long as those violations are a present threat to health or the environment." *Parker*, 386 F.3d at 1014 (citing *Meghrig*, 516 U.S. at 485–86 (1996)). The "present threat" language of § 6972(a)(1)(B) directs the Court to inquire as to the state of the endangerment at the time of the action's filing.

Defendants argue only that the leakage of gasoline from their pipeline "may not constitute an imminent and substantial endangerment to health or the environment" under § 6972(a)(1)(B). (Doc. 55 at 31.) The Eleventh Circuit has characterized the language of § 6972(a)(1)(B) as "expansive," "confer[ring] upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." *Parker*, 386 F.3d at 1015 (emphasis in

original) (quoting *United States v. Price*, 688 F.2d 204, 213–14 (3d Cir. 1982)). As the "operative word in the statute is the word 'may,'" a plaintiff "need only demonstrate that the waste disposed of "may present" an imminent and substantial threat. *Id.* Thus while the endangerment must be imminent, that is "threatening to occur immediately," there must only be the potential for an imminent threat. *Id.* (citing *Meghrig*, 516 U.S. at 486). An endangerment is "substantial" if it creates a threat of "serious harm to the environment or health." *Id.* (citing *Cox v. City of Dallas*, 256 F.3d 281, 300 (5th Cir. 2001)).

Plaintiffs first attempt to show an imminent and substantial threat to human health by reference to statements made by David Chung ("Chung") about certain testing on the eastern side of Double Mountain. Chung performed exploration excavations at the Shelby County water pipeline to determine whether it was in contact with gasoline, (Chung Depo. at 83), as gasoline could damage the seals between pipe sections if they were improperly installed. (*Id.* at 84.) However, Chung did not testify to the presence of any gasoline in the exploratory excavation sites. (*See id.* at 83-85.) Plaintiffs' argument, reduced to its barest form, invites the Court to find an RCRA violation where there is a mere possibility that if the seals between water lines were improperly installed *and* gasoline was shown to be

present, there would be an imminent and substantial threat. Given that Plaintiffs have not offered proof of either of these conditions, both of which are necessary to disrupt the integrity of the water line, this theory does not satisfy § 6972(a)(1)(B).

Plaintiffs next offer deposition testimony of Chung, Sulkin, and Grant Upton concerning the noxious fumes created by the gasoline after its release. Plaintiffs again cite to Chung's statement about "risking his life," and that the workers "needed to wear respirators"; however, these statements appear to be in reference to the time during the initial release, not at the time of the suit two years later. (*See* Chung Depo. at 26-27.) Grant Upton testified that on the day the release was discovered his "eyes were dry." (G. Upton Depo. at 44.) Such a minor reaction does not show substantial endangerment, and certainly not at the time of suit. Finally, Sulkin testified that inhalation of gasoline fumes can cause "drowsiness, headaches, and even unconsciousness," but had done no testing of the air quality on the Plaintiffs' property. Instead, he stated that he smelled a stronger gasoline smell than at a gasoline station, and believed that the smell would indicate high enough concentrations to cause harm to human health. (Sulkin Depo. at 177-78.) Sulkin based his statements on the adverse effects of gasoline inhalation on "EPA documentation," but admitted that he does not know at what levels such adverse

effects manifest. His "smell test" methodology is in no way tied to the EPA documentation that he refers to, but instead is his speculation that a strong gasoline smell will cause those effects. Sulkin's testimony does not show an imminent and substantial endangerment to human health.

While Plaintiffs have failed to show that the pipeline's release may cause an imminent and substantial endangerment to human health, whether the release poses such a risk to the "environment" is a closer question. No binding precedent has adequately discussed whether the presence of certain levels of gasoline presents an imminent and substantial endangerment to the environment.

Plaintiffs present as additional evidence deposition testimony to show that the Defendants' pipeline's leak "may present an imminent and substantial endangerment to . . . the environment." They first state that "it remains undisputed the soil, surface water, groundwater, and wetlands on the Upton's property is contaminated with petroleum, toluene, benzene, and BTEX. (Doc. 62 at 29.) They cite as support statements made by Chung during his deposition on his initial findings during the discovery of the leak in 2014—obviously this testimony has no bearing on what the situation in Plaintiffs' property was in 2016 at the time of the suit after significant efforts by Defendants to remediate the property. (*See*

Chung Depo at 9, 25.) Plaintiffs also quote Defendants' expert Steven C. Hart ("Hart")'s deposition, where he was asked about his expert report "concerning the presence of groundwater (including seeps/springs) and surface water conditions associated with a release of gasoline from [Defendants'] pipeline." (Doc. 55-37 at 3.) Hart concludes that there is "[A] small area of groundwater impact . . . present in the northeastern corner of the Defendants' property from the [Defendants'] release." (Doc. 55-37 at 3; *see* Hart Depo. at 100.) Hart explained that "groundwater impact" means "groundwater with dissolved phase or it could be free phase contamination from the [Defendants'] release that is above the MCL [EPA maximum contaminant levels]." (Hart Depo. at 100.) CH2M likewise has concluded in their Comprehensive Site Assessment that as of February 2016, "at least one BTEX constituent concentration exceeded the EPA Region 4 freshwater ecological screening level for chronic exposure at nine locations." (Doc. 55-11 at 27.) Plaintiffs, however, never attempt to explain what the applicable standards mean or how they apply to the RCRA, and the Court declines to make Plaintiffs' arguments for them. Nor do Plaintiffs elaborate or show how groundwater impacts creates substantial endangerment to health or the environment. They cite to the deposition of Defendants' expert Jerry Aycock ("Aycock") for the proposition that

"[p]etroleum and its constituent parts are known to be harmful to the environment." (Doc. 62 at 29.) However, the cited portion of Aycock's deposition has no bearing on Hart's conclusion that the groundwater impact was above the MCL in part of Plaintiffs' property:

Q: . . . Generally speaking, when you have a release of gasoline into the environment, it has a harmful effect?

A: Typically.

Q: And leaking gasoline can represent a health risk to the public?

A: Correct.

Q: It can harm property? Leaking gasoline

A: Depends on the situation. I don't know how you harm property. It contaminates soil and groundwater and potentially surface water.
So it may have an effect on the—on the use of the property. So, therefore, that would be the case. But just because you put gasoline into soil doesn't harm the property. It just contaminates the soil.

Q: So contaminated soil is not the same as harm to property?

A: There—there are literally millions, if not billions, of properties that are contaminated that are actually bought at a premium price, developed, and used without harm.
So I would have to say, as an environmental professional, that even though that property is contaminated, it's not harmed.

(Aycock Depo. at 40-41.) Plaintiffs additionally cite to the presence of "red orange flocculent" in the Defendants' properties, but do not explain how that is harmful. In fact, in Harm's expert report, he explains that "iron precipitate" can occur in areas near a release and then migrate to other areas not necessarily impacted by a release. (Doc. 55-37 at 15-16.) In any case, the presence of red orange flocculent does not show substantial endangerment.

Plaintiffs then state that "[p]etroleum continues to seep out of the earth from at least 23 different locations on the [Plaintiffs'] property." They cite to Sulkin's deposition for this statement, but Sulkin does not make any findings or conclusions to such at the cited page number, and after thorough search the Court is unsure on what Plaintiffs base this statement. At one point during his deposition, Sulkin refers to "23 seeps," but from the context he did not mean that petroleum was seeping out of the ground. (Sulkin Depo. 390:5-6 "I don't know where the 23 seeps are they plan to monitor."). Rather a seep is just a point where groundwater reaches the surface. (*See* Doc. 55-11 at 27 ("[Petroleum] produce has not been observed in springs or seeps since late March 2015."). Plaintiffs additionally cite to Chung's deposition for their proposition, but the page number they cite does not support their argument that there is an active petroleum leak or there are twenty-

three different locations identified that have active leaks. (*See* Doc. 62 at 25 (citing Chung Depo. at 155).)

Finally, Plaintiffs refer to deposition testimony by Grant Upton and Sulkin concerning dead wildlife they saw on the Plaintiffs' property. However, Grant Upton's statement that he saw 2-3 dead frogs, a dead lizard, and some dead fish on the day that he discovered the release is hardly helpful to whether the status of the release when Plaintiffs filed suit in 2016 may have presented an imminent and substantial endangerment. The additionally cited testimony by Grant Upton and Sulkin are all hearsay statements concerning what Grant was told about the lack of woodland ducks that formerly inhabited the property by his father or what Sulkin was told about the presence of different animals to include in his expert report. The supposed impacts to wildlife is contradicted by Grant Upton's additional testimony that he continues to hunt deer and turkey on the property, and takes third parties to hunt there as well. (G. Upton Depo. at 91-93; 113.) Plaintiffs have presented no other evidence sufficient to show an RCRA violation, and this claim is due to be dismissed.

## V. CONCLUSION

For the reasons stated above, Defendants' Motion for Partial Summary Judgment is granted; their Motion to Exclude Testimony of Barry Sulkin is due to be granted; and their Second Motion to Exclude is due to be denied as moot. Plaintiffs' negligence and nuisance claims remain pending as Defendants have made no argument in regard to either claim. A separate Order consistent with the Opinion will be entered separately.

**DONE** AND **ORDERED** ON JUNE 4, 2018.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

190485